Pages 1-27

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                         OAKLAND DIVISION

3

4  IN RE UBER TEXT MESSAGING    )  Case No.  18-cv-02931-HSG
                                )
5                               )  San Francisco, California
                                )  Courtroom F, 15th Floor
6                               )  Tuesday, October 15, 2019
                                )
7  _____)

8

9
                     TRANSCRIPT OF DISCOVERY HEARING
10          BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY
                  UNITED STATES MAGISTRATE JUDGE
11

12  APPEARANCES:

13  For Plaintiffs:              SIMON S. GRILLE, ESQ.
                                 ANGELICA M. ORNELAS, ESQ.
14                               Girard Sharp LLP
                                 601 California Street, Suite 1400
15                               San Francisco, California 94108
                                 (415) 981-4800
16
    For Defendant:               TIFFANY CHEUNG, ESQ.
17                               Morrison & Foerster LLP
                                 425 Market Street
18                               San Francisco, California 94105-2482
                                 (415) 268-7000
19
    Transcription Service:       Peggy Schuerger
20                               Ad Hoc Reporting
                                 2220 Otay Lakes Road, Suite 502-85
21                               Chula Vista, California 91915
                                 (619) 236-9325
22

23

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

1  SAN FRANCISCO, CALIFORNIA  TUESDAY, OCTOBER 15, 2019  9:02 A.M.

2                            --oOo--

3           THE CLERK:  Calling Civil Action C-18-2931, In re Uber

4  Text Messaging.  Counsel, please come up to the podium.

5           MR. GRILLE:  Good morning, Your Honor.  Simon Grille for

6  the Plaintiffs.

7           THE COURT:  Good morning.

8           MS. ORNELAS:   Good  morning,  Your  Honor.   Angelica

9  Ornelas from Girard Sharp also for Plaintiffs.

10           THE COURT:  Good morning.

11           MS. CHEUNG:  Good morning, Your Honor.  Tiffany Cheung

12  of Morrison & Foerster on behalf of Defendant Uber.  Good morning.

13           THE COURT:  Okay.  So I think there are two issues.

14  Right?  The first is sort of the scope of the call logs that the

15  Plaintiff seeks and whether they can get logs reflecting any calls

16  that were made following receipt of a wrong number -- or not

17  calls, I guess texts -- following receipt of a "Wrong number"

18  text.

19      And the second is Plaintiff's request for names and telephone

20  numbers from the logs.  Is that right?

21           MS. CHEUNG:  That's right.

22           MR. GRILLE:  That's correct.  I would add that part of

23  the dispute here is the content of the text messages.  It should

24  be subject to the data production.  We define text messages to

25  include three examples that we give of text messages, and Uber's

1   only agreed to produce one of those examples, and we're moving to

2   compel all three of the examples.

3         THE COURT:  Okay.  Is that the -- I guess I don't -- is

4   that a third issue?

5         MR. GRILLE:  Yeah.  That falls -- yes, Your Honor.  That

6   falls within the definition of text messages that's in our

7   requests.  We define it to include, number one, messages that

8   reference an Uber code; number two, messages that say "SMS from

9   Uber is now disabled" to being able to reply "Start," and I'll

10  pause there because, unless I'm wrong, Uber agrees to produce

11  those categories.

12      We define a third category of text messages which says,

13  "However, we don't respond" -- "We don't monitor responses on this

14  number.  Need help, visit help.uber," and Uber does not agree to

15  produce those text messages.

16        THE COURT:  Okay.  All right.  So that's a third issue.

17  Do you agree that that's raised by the discovery letter?

18        MS. CHEUNG:  That was not what we had interpreted as

19  being raised by the discovery letter, although it is true that we

20  have not agreed to produce --

21        THE COURT:  Okay.  All right.

22        MS. CHEUNG:  -- that category of documents.

23        THE COURT:  We'll put that last then.  All right.  So

24  let's just start with the wrong number.  And I guess my initial

25  reaction is that it's not apparent to me that -- well, the class

1  definition itself is -- the reply stop class, right, is where the

2  recipient texts "STOP" and "Cancel" or similar language.  And it's

3  not clear to me that "Wrong number" isn't similar to "STOP,"

4  "Cancel," "End."  Right?  I mean, they're saying wrong number

5  because they want the texts to stop.  So --

6          MS. CHEUNG:  Well, let me pause there, Your Honor,

7  because I don't think that that's necessarily the case.  They have

8  indicated "STOP," "End," and "Cancel," and we have agreed to

9  produce what Uber's records recognize as a request to stop sending

10 text messages, and that is beyond just the word "STOP."

11     "Wrong number" is different in that, first of all, folks can

12 text wrong number and it may not very well be a wrong number.  And

13 it's different in this case because it matters because what

14 Plaintiffs are trying to do is concoct some kind of theory that

15 this was a wrong number claim when this isn't.

16         THE COURT:  Well, let's just say it's not.  But I can

17 see you get a text, you don't remember consenting to it, so you

18 say "Wrong number," but what you're really saying is "Stop.  I

19 don't want to get any more texts."  In other words, I think wrong

20 number.  An inference can be drawn -- this is just discovery -- is

21 "Wrong number" means "STOP."

22         MS. CHEUNG:  And that -- that might be in some

23 individual circumstance.  That is not certainly the Plaintiff's

24 claim here.  That is not what she claimed.  That is not what she

25 did.

1          THE COURT:  She didn't do "Wrong number."  She said --

2    she said "STOP."

3          MS. CHEUNG:  She did.

4          THE COURT:  Right.  I guess what I'm saying is Judge

5    Gilliam hasn't ruled -- it's Judge Gilliam's case; right?

6          MS. CHEUNG:  That's correct.

7          THE COURT:  He hasn't ruled that she can't represent

8    that the scope of the class -- and this is discovery.  Now, it

9    might be if you had some ruling that said no, but I guess what I'm

10   saying is it's not apparent to me -- sometimes it is.  Sometimes

11   plaintiffs seek discovery that's like, No, you're never gonna --

12   that's never gonna fall, but it's not apparent to me that that is

13   -- that the scope of the class, that the Plaintiff won't -- Ms.

14   Rogers, won't be able to represent those people.

15       And what are we talking about in terms of numbers?

16          MS. CHEUNG:  Well, but, I mean, what they've asked for

17   already and we've agreed to produce, Your Honor -- and that's a

18   fair question because what they've asked for is everyone who's

19   received a two-factor authentication message.  And to back up,

20   that will include everybody who's tried to log onto their Uber

21   accounts.  Because when you are logging onto your Uber account,

22   the reason why these messages are sent is because you've provided

23   a piece of identifying information, so your phone name or your

24   email address, as well as your password for your Uber account.

25       Once you've provided your phone number and password, the two-

1  factor authentication messages are sent in order to verify that

2  you own the phone number that you are trying to log in on.  And

3  because of that, that's going to be every single person who's

4  tried -- who's input their identifying information, their password

5  and tried to log onto an Uber account since August of 2017.

6          THE COURT:  I thought it was only numbers in response to

7  them getting --

8          MS. CHEUNG:  No.  They want everyone who's received a

9  two-factor authentication message.

10         THE COURT:  Then what does the wrong number have to do

11 with anything?

12         MS. CHEUNG:  It doesn't have anything to do with -- this

13 is why we believe it's --

14         THE COURT:  Now I'm completely confused.  Why are we --

15 why are we even discussing the wrong number then if you've asked

16 for everything, regardless of whether they texted anything back?

17         MR. GRILLE:  Wrong number comes up in two points in this

18 analysis.  The first is that we are going to conduct an analysis

19 of the phone numbers who received a text message and compare that

20 with a data aggregate or like LexisNexis and TransUnion to

21 determine whether those people truly consented to receive the

22 message.

23     So Uber sent text messages and its databases say the phone

24 number and the name of the person to whom it sent those text

25 messages.  We're asking for that data.  And this is why we're

1  asking for name, phone number, so that we can --

2          THE COURT:  I'm on the wrong number.  I'm completely

3  confused now.  I don't understand.  Is it the case that you're

4  asking for every -- the log for everyone who got a two-factor

5  authentication?  I mean, it must be that 95 percent of those are

6  people who did; right? -- who consented and who did.  I get those

7  all the time.  You're not asking for those?

8          MR. GRILLE:  We are, Your Honor.

9          THE COURT:  Why?

10          MR. GRILLE:  And your question to Ms. Cheung is a good

11  one.  We've asked it several times.

12          THE COURT:  No, no, no.  Why?  Why do you want -- why do

13  you get -- why do you get the logs for the -- that are completely

14  legitimate?  I don't understand that.  What I thought you were

15  asking for -- what the letter presented -- was in response to

16  "STOP" and "Cancel," "Wrong number."  They then sent another text.

17  That, I understand.  Why do you get the two-factor authentication

18  to begin with?

19          MR. GRILLE:  Because there are "Wrong number" texts in

20  the first instance that went to somebody who never consented

21  because --

22          THE COURT:  Not Ms. Rogers.

23          MR. GRILLE:  Not --

24          THE COURT:  Did she allege -- okay.  So now I

25  understand.  Nope.

1      MS. CHEUNG:  Uh-huh.  Uh-huh.

2      THE COURT:  Not going to do that.  That is way beyond.

3  I thought it was in response to, but now you're just fishing for

4  -- trying to figure out the wrong numbers among the millions, I've

5  got to think, of two-factor authentication.  I mean, why would you

6  -- I don't understand that at all.

7      MR. GRILLE:  Well, we've seen it from people who

8  contacted our firm and that we had a --

9      THE COURT:  No, no.  Are they a Plaintiff?  By the way,

10  your Plaintiffs have fallen away.  We have one left.  She didn't

11  get a new Plaintiff then; right?  She's not a "Wrong number."

12  She's a "I said stop."  That, I understand, and that I say if you

13  want the logs in response to "STOP" and "Cancel," "Wrong number,"

14  and yet they send another text, okay.  I mean, I don't know.  If

15  they sent one further text saying, You got it.  We're going to

16  take you out, fine.  I think -- I'm not sure that's the best use

17  of the court system for that particular thing but, in any event,

18  you have an argument.  That's fine.  You can have those.

19      But why would you -- I don't even -- I don't get it.  Ms.

20  Rogers --

21      MR. GRILLE:  It's a typicality question really because

22  she seeks to represent a class of people who didn't consent to

23  receive these text messages, and consent can be revoked.

24      THE COURT:  Yes, and she's a revoked person.

25      MR. GRILLE:  She is.

1          THE COURT:  Yes.

2          MR. GRILLE:  And in fact, we would argue that she's

3  never consented in the first place.  Uber's going to have an

4  argument against that, but it's going to be a disputed issue of

5  fact because she started maybe a driver application which was

6  unrelated four years ago and, as Judge Tigar has ruled in that

7  *Reardon* case, starting the application but not finishing it

8  doesn't equate to consent.

9      So we're going to argue that she's not a consent in the first

10  instance person.  We don't argue at this time that she's a

11  reassigned number person, but we're saying that she seeks to

12  represent a class of people who either didn't consent in the first

13  instance or revoked consent, and the didn't consent in the first

14  instance is that group of wrong number people.

15          THE COURT:  It was not a wrong number.  She put the

16  correct number.  It's not a wrong number.  She put the correct

17  number.  It's not -- it's not a wrong number.  I mean, I don't

18  even know if it was a wrong number, you could get every single --

19  are you willing to pay for it, by the way?

20          MR. GRILLE:  What we're willing to do is we've retained

21  a  database  expert  and  he  can  extract  the  data  because  we

22  understand this to be saved in a SQL database which is designed to

23  produce  large  data  pools  like  this.  And  we  have  not  learned

24  anything about the number of texts that are at issue.  We've had

25  two in-person meet-and-confers and several on the phone and in-

1  person confers.  We've asked several times.  We have no idea how

2  many text messages are at issue.  We have no idea of what the cost

3  is.  We don't have any of that kind of information to evaluate the

4  burden objections that they're making.

5      And, you know, if we had that, we'd be more willing to

6  understand and able to narrow it in this way --

7          THE COURT:  Well, I think it's already narrowed.  That's

8  not your Plaintiff; right?  I mean, when you started to say, Well,

9  we've had people contact my firm," that's like, ooh, red flag.

10 That's a different case or a different plaintiff; right?  But, no,

11 I'm not going to order them to disclose every single text they

12 sent in response to the two-factor authentication.  That's -- no.

13 You don't get that.

14     Now, what I understood it to be was every text in response

15 to, including "Wrong number."  That I think falls within your

16 class -- potentially within your class definition, so I will order

17 and have them ordered to produce the logs of those.

18         MR. GRILLE:  And we appreciate that and we absolutely --

19 we want that to include responses other than just "STOP" and

20 including response such as "Wrong number."

21         THE COURT:  Yes.  I'll order that.  That, I understand.

22 I think "Wrong number" is the same -- can be inferred as the same

23 thing as "STOP."  If your theory is that then in response to that

24 text, they then sent another text, that consent had been -- if

25 there was consent, it was revoked.  Maybe there was never consent

1    if it was "Wrong number," but who knows?  Right?  Someone could

2    say "Wrong number" and be wrong, but it certainly means, Don't

3    send -- could mean, Don't send any more texts.  So I think Uber

4    should produce those logs.

5              MS. CHEUNG:  We understand what you're saying, Your

6    Honor.  I mean, we continue to believe this is not a wrong number

7    case and this is what they are that -- and to your point, the

8    Plaintiff is not a wrong number Plaintiff which is why we don't

9    think the text "Wrong number" is meaningful.

10             THE COURT:  No, but it could be -- but I guess "Wrong

11   number" could also fall within a revocation class is what I'm

12   saying.

13             MS. CHEUNG:  And --

14             THE COURT:  Right?  Or a class that just means, Once we

15   said don't send me, whether it was a lack of consent to begin with

16   or a revocation, Don't send me any more texts.  It could fall

17   within that.

18             MS. CHEUNG:  I understand what you're saying about

19   inference.  We would dispute that just because, again, Your Honor,

20   particularly given their definition as being "STOP" and "Cancel"

21   or something similar, we're going to dispute that that's -- you

22   know, there's some bound to that.  We cannot be expected to

23   interpret, you know, every individual response and they come back,

24   Is it a revocation, Is it not a revocation.  There's got to be

25   some bounds --

1          THE COURT:  I understand.

2          MS. CHEUNG:  -- to what --

3          THE COURT:  But it's reasonable to infer -- and I would

4  expect that Uber would infer when someone says "Wrong number,"

5  they don't want any more texts.  I don't think you're going to

6  tell me that, no, it's reasonable for Uber to infer that means,

7  Keep sending me texts.

8          MS. CHEUNG:  I think there are different reasons why

9  someone could text "Wrong number."

10         THE COURT:  And that -- we're actually not even going to

11 that reason.  We're going to what the -- anyway, this is

12 discovery, so I think it's that.  And also there's been -- and I

13 don't -- and I don't know what that number is.  Now that we've --

14 it's not every single -- it's just in response to those, the logs

15 of those.  And I haven't heard anything that they can't do that.

16 Right?  They did the other ones -- "End," "STOP," "Cancel."

17         MS. CHEUNG:  No, that's right.  We have agreed that if

18 there was a "STOP" request or something --

19         THE COURT:  Okay.

20         MS. CHEUNG:  -- that is recognized as someone saying

21 they are no longer wishing to receive text messages, according to

22 Uber systems.

23         THE COURT:  Now, as to name and telephone, now that

24 you're not going to get every single two-factor authentication

25 texts, why do you need the name and telephone number?

1          MR. GRILLE:  We'd still perform the same analysis, so

2    we're going to get everybody who got a two-factor authentication

3    text after saying "STOP" or "Wrong number" or some similar

4    command, and we can perform the same analysis with that as another

5    backstop to say this person didn't consent.  There's an entire

6    group of people who weren't even the number that Uber was trying

7    to reach.  And the only way we could do that is if we have the

8    phone number and names that are in Uber systems.

9          THE COURT:  Can you -- just -- I'm not familiar with

10   this so just, again, how are you able to show that?

11         MR. GRILLE:  Sure.  We take the names and phone numbers

12   listed in Uber system to which the text messages were directed.

13   We use a data aggregator like LexisNexis or TransUnion to look up

14   -- it's called reverse look-up those phone numbers.  And we will

15   receive from that a -- that information will show the names of the

16   people who customarily and currently use those phone numbers, and

17   then we can compare the names that are in Uber system with the

18   names from the data aggregator, and then that combined with, for

19   example, the person saying "Wrong number" and "STOP" is pretty

20   good evidence that they never consented in the first place and

21   certainly there's evidence that they revoked consent.

22         THE COURT:  That they never consented in the first place

23   'cause it's not their number?

24         MR. GRILLE:  Correct.

25         THE COURT:  But that's not your -- that's not Ms.

1  Rogers' claim.

2            MR. GRILLE:  It's not --

3            THE COURT:  She says it is her number.  She's just

4  saying by not completing the application, I didn't consent.

5            MR. GRILLE:  It's not identical to Ms. Rogers' claim,

6  but it's really going to be an argument of typicality of class

7  certification, and we can make the showing that the common course

8  of conduct here is the same for Ms. Rogers as it would be for this

9  wrong number Plaintiff, and there aren't unique defenses that are

10  going to apply to her that would preclude us from certifying a

11  class on that basis.

12            THE COURT:  Yeah.  The wrong number cases are very

13  different.  Judge Rogers now, you know, has denied cert in a wrong

14  number -- or it wasn't a text.  It was a -- it was a call.  It was

15  a call -- a call case.  I mean, that's a very -- right?  Because

16  what you have is people input the wrong number.  Somebody else

17  might have -- get a number and they put in an incorrect number.

18  People of course do that intentionally all the time because they

19  don't want to get called.  But they want to get the service.  If

20  you're doing it for two-factor -- I mean, it's problematic; right?

21  It is a problem that companies have to deal with, which is that

22  people are putting in -- I know companies like to say it's

23  fraudulent.  I actually don't think it's fraudulent.  It's just

24  trying to protect from texts.  Somebody put in the wrong number.

25         But I just think that's really far afield of what this case

1  is now.  On the other hand, though, I don't want you as a

2  discovery matter to sort of defeat your ability to make that

3  argument on class cert.  So Uber then I think would need to

4  stipulate somewhat that if, let's say, Ms. Rogers is allowed to

5  represent that class, that there aren't any defenses that are

6  unique to the data; in other words, that I'm now not ordering to

7  produce.

8       Does that make sense, Ms. Cheung?

9       MS. CHEUNG:  Your Honor, it does.  I mean, to answer

10  your question, though, I mean, I agree with you that the wrong

11  number cases really are different.  There are going to be

12  different issues.  There is certainly no indication that

13  LexisNexis or whatever data aggregator that they're purporting to

14  use is going to have accurate information either.  It just doesn't

15  show that there was a wrong number.  They are literally fishing

16  for a plaintiff who has a wrong number claim.  They don't have

17  one.

18      They're going to try to use a third party with -- with

19  information that may or may not be accurate, try to match it

20  against Uber's data, and then create a wrong number claim when

21  they don't have one now.

22      Ms. Rogers admits that it was her phone number that she

23  voluntarily provided when she registered for an Uber account.  And

24  that was the phone number that was the intended recipient of the

25  text message.

1    There just simply isn't a wrong number thing.  They're trying

2    to create one out of whole cloth using a data aggregator that may

3    or may not have accurate information and try to match it against

4    Uber's records.  That just simply is not within the scope of their

5    complaint.

6        And that's the reason why --

7        THE COURT:  What you put in your letter was that you

8    needed that information "for Plaintiffs to demonstrate that class

9    members can be identified and that there are no manageability

10   concerns."  That's different from what you're articulating this

11   morning.

12       MR. GRILLE:  Well, we want to identify the subgroup of

13   class members who are the reassigned number or wrong number

14   people.  And the way we do that is through this reverse look-up

15   procedure.

16       And, you know, I could point to the *Brown v. DirecTV* case

17   from the Central District of California, where two classes were

18   certified.  The plaintiff was somebody who alleged no prior

19   relationship with DirecTV and she represented both a class of

20   people like her who had no relationship with DirecTV, but also

21   people who did have a relationship with DirecTV but didn't provide

22   their number for the particular reason that debt collection calls

23   were made.

24       So there's authority that somebody like Ms. Rogers, who has

25   claims that we argue are typical of the class, can represent

1  others who aren't identical to hers but arise from the same course

2  of conduct.  She's alleging the same TCPA, and the way I look at

3  it is no consent is the broad umbrella that includes all these

4  people.

5       For example --

6       THE COURT:  I understand.  I think you should be able --

7  although I have my skepticism, I think you should be able to argue

8  that.  I'm not disputing that.  I guess what I'm saying to Ms.

9  Cheung is can we agree that if they don't have this data, that

10  won't prejudice their ability to make that argument on class cert;

11  right?

12       MS. CHEUNG:  I mean, they can certainly make any

13  argument.  We would obviously dispute that.

14       THE COURT:  No, no, no.  I understand.  But what I don't

15  want you to say -- what I don't think would be fair for Uber to

16  say is, Well, but they didn't get this data or they haven't been

17  able -- you know what I'm -- in other words -- but I guess I'd go

18  back to your letter and I would say -- again, I looked.  I mean,

19  this is all you said.  I didn't even have to have this hearing.

20  I could have just ruled on the papers.

21       So tell me where this even is articulated in your papers.

22  That's what I kind of don't understand.  You say demonstrate --

23  "can be identified and there are no manageability concerns."  So

24  what I was thinking is Uber will have to admit that those names

25  and phone numbers are there, that they have -- they have them;

1    right?  And then you'll put forward to Judge Gilliam what your

2    methodology is as to what you would do with that data so it can be

3    done on a class-wide basis.  Right?  You would --

4              MS. CHEUNG:  That's correct.

5              THE COURT:  -- stipulate that you have the name and

6    phone number.  So they stipulate and they agree that -- agree to

7    that.

8              MR. GRILLE:  That's -- I think then the only difference

9    is that we're saying that we could run the analysis on the front

10   end.  I mean, we can -- if Uber stipulates that we have this data

11   and we can say this is the methodology -- we just can't run it

12   until we have the data.

13             THE COURT:  Yeah.

14             MR. GRILLE:  But we could present a class certification

15   and methodology.

16             THE COURT:  Right. That's what I'm saying.  But I guess

17   the next question, though, is for those that you are -- the logs

18   that you are producing, it seems to me it's a burden to actually

19   redact the name and phone numbers as opposed to providing those.

20             MS. CHEUNG:  What we would propose and what we have

21   proposed, Your Honor, is to assign a unique identifier.  So it

22   doesn't -- it protects against the PII, which is the name and the

23   phone number that we are trying to protect privacy interests for

24   a  large  number  of  people,  but  assign  some  kind  of  unique

25   identifier.  So instead of having my name, Tiffany Cheung, it will

1    say "1234" so that you know that this is the same person but it's

2    anonymized so that --

3              THE COURT:  But why?  But, I mean, is it going to be

4    produced subject to a protective order?

5              MS. CHEUNG:  It is, Your Honor.  It is, Your Honor, but

6    we don't believe that they -- because of the man- -- you know,

7    they have said they need these logs to show manageability, we

8    think that that is accomplished by this unique identifier without

9    the need of even having to deal with potentially disclosing a

10   large number of phone numbers -- cell phone numbers and names for

11   folks when there's no need.

12       So when you're --

13             THE COURT:  Well, if the class is certified, they're

14   going to get it anyway.

15             MS. CHEUNG:  If a class is certified, that's right, Your

16   Honor.

17             THE COURT:  Right?

18             MS. CHEUNG:  Post-certification, we -- and that was the

19   reason that they gave us initially, that they need to send notice

20   out.  And that may very well be once a class is certified.

21             THE COURT:  Yeah.

22             MS. CHEUNG:  At this stage, there's no need for the name

23   and phone number information, other than to create this wrong

24   number claim that they don't currently have.

25             THE COURT:  Well, but I guess what I'm saying is -- and

1  I'm not the trial judge, right, so I can't adjudicate that -- I

2  guess I don't understand -- I mean, --

3        MS. CHEUNG:  The other thing I would say --

4        THE COURT:  -- they gave -- the person gave their name

5  and phone number to Uber, so I think the privacy concerns are

6  less, right?  I mean, we're not talking about a search warrant or

7  anything.

8        MS. CHEUNG:  Well, yes, they gave it to Uber.

9  Obviously, sharing it beyond -- beyond Uber, which is the entity

10 that they were intending to share it with, is going to be a

11 privacy concern and Uber takes it very seriously.

12     And the other thing I would say is Plaintiffs have

13 essentially conceded they're trying to create a new claim because

14 they're saying they would use it to allege a new sub-class of

15 wrong number folks.  They don't currently have that class.

16     Their discovery is bound by the complaint.  The governing

17 complaint does not have a wrong number sub-class, and they don't

18 have a plaintiff to represent that class.

19       THE COURT:  Okay.  Yeah.  So let me -- so I was looking

20 at the "Reply STOP" class.  What class would this fall into, the

21 information that you're seeking?

22       MR. GRILLE:  This is the auto-dial no consent class.

23       THE COURT:  Yeah.  Why wouldn't it fall within that?

24       MS. CHEUNG:  Well, what they're claiming is that what

25 they would do is allege a new sub-class, which they don't

1    currently have and they I think are admitting they don't have a

2    plaintiff to represent that sub-class.

3        The other thing I would say --

4            THE COURT:  No.  They're not admitting that at all.

5    They're arguing that their Plaintiff can represent that class.

6            MS. CHEUNG:  And we don't agree.

7            THE COURT:  No.  I understand.

8            MS. CHEUNG:  We think that it's a wrong number case.

9    And the *DirecTV* case was also very different.  In that case, the

10   defendant actually alleged -- or the plaintiff alleged she had no

11   relationship with DirecTV.  In other words, it could have been a

12   wrong number because she in fact admitted she didn't -- and denied

13   that she gave her phone number to DirecTV.

14       This is a different case.  The Plaintiff here concedes that

15   she gave her phone number to Uber.  She gave her email address to

16   Uber.  She authorized a background check.  It's her.  She's the

17   one who gave the phone number to Uber to begin the process of

18   registration to drive with Uber.

19       *DirecTV* was completely different and actually it supports our

20   claim, our position here.  Because in that case, the DirecTV

21   plaintiff said she did not have any relationship with the

22   defendant.  That is not this case.  That is not this case.

23           THE COURT:  But I guess I -- this can't be a burden on

24   you because it's more of a burden on Uber to assign some number to

25   these people.

1          MS. CHEUNG:  Well --

2          THE COURT:  I mean, basically it's just trying to keep

3   this information out of the Plaintiffs' counsel's hand.  I mean,

4   that's what it is.

5          MS. CHEUNG:  Well, it's -- it does start, though, with

6   the Plaintiffs' burden to show that it is relevant.  And -- and we

7   don't believe that they have shown that and that it falls within

8   the scope of their complaints.

9      I think that's where the analysis starts and then, yes, there

10  is  certainly  a  burden  argument  to  consider  when  there's  a

11  balancing to be done, but it starts with is it within the scope of

12  their allegations, and it is not.  It --

13         THE COURT:  Well, there's a dispute as to that.  He put

14  forth an argument as to why she would be able to represent that

15  class.  There's a dispute here, right, and it's discovery.  So I

16  understand that.  And you're not going to produce every call log,

17  just the one in response to "STOP" and "Cancel," "Wrong number."

18  You're going to produce those logs.

19      And the question is whether you should redact the name and

20  telephone number, do an extra step as opposed to just produce it

21  subject to the confidentiality.  You're not going to contact these

22  people; right?  I mean, sometimes you want to, but not in this

23  matter because that would just be piling it on.

24         MR. GRILLE:  We're not.

25         THE COURT:  No.

1        MR. GRILLE:  And the claim that we're going to use this

2   information to try to solicit new clients, there is no basis.

3        THE COURT:  Yeah, and you would agree as -- you would

4   agree not to use the information to contact.  I mean, the only way

5   you could contact them would be to contact them, and the argument

6   is that their privacy and they're being harassed by being

7   contacted.

8        MR. GRILLE:  I absolutely agree not to solicit new

9   clients from the databases --

10        THE COURT:  No.  No.  You're being too cute.  Do you

11   agree not to contact them without further order from the Court?

12   In other words, you articulated, We're going to run this

13   information through this data aggregator; right?  So you can make

14   some argument as to whether -- why Ms. Rogers can represent them

15   -- Ms. Rogers, who's your current Plaintiff.  Would you agree not

16   to use that information to contact those people?

17        MR. GRILLE:  I'll agree, with the caveat that there is

18   authority that counsel can contact absent class members in order

19   to investigate facts that would support class certification.

20        THE COURT:  Yes.

21        MR. GRILLE:  So there isn't an absolute bar --

22        THE COURT:  No, no, no.  I understand.  But I'm saying

23   at this point because you articulated to me a particular reason

24   for needing the information which, by the way, wasn't in your

25   letter.  But I'm going there anyway.  And this now new thing also

1   isn't in your letter either.  So you need to -- I don't even have
2   to have these hearings.  You should really put everything in your
3   letter because that's what we're going to do.
4        But -- all right.  So I think what I'm going to do, I'm going
5   to order just the texts in response to those, the logs for that,
6   name and number, subject to a protective order, and counsel is not
7   to contact anyone out there.  So they can do that so that they can
8   make their class certification argument and you can make your
9   opposition to the class that it's not typical or whatever, but
10  then it's all there.  Then I don't feel like I'm prejudicing their
11  ability to make their argument.
12            MR. GRILLE:  Thank you, Your Honor.
13            THE COURT:  I've made everybody unhappy.  Okay.  All
14  right.  Thank you.
15            MS. CHEUNG:  Thank you, Your Honor.
16            MR. GRILLE:  I think if I may, the only --
17            THE COURT:  Yeah.
18            MR. GRILLE:  -- the last thing to be heard is just the
19  question of that, "Hello.  We don't respond to these messages."
20  I want to clarify that that's part of the data production.  It is
21  in our letter -- and I can point to that.
22            THE COURT:  So it's a log of -- it's a log of every text
23  that was sent in response to "STOP," "Cancel," "Wrong number."
24            MR. GRILLE:  Right.
25            THE COURT:  And so -- isn't it?  I mean, why should

1  certain responses be excluded from that log?  You can make

2  whatever argument you want to Judge Gilliam as to why any of them

3  or all of them -- I assume you're going to argue that none of them

4  are in violation of the TCPA, but I don't know why we should

5  exclude those from the log.

6           MS. CHEUNG:  Understood that what you're ordering, Your

7  Honor, is just the text messages that say "STOP," "Cancel," or

8  "End" and whatever the response was to "STOP," "Cancel," and

9  "End," and you're adding "Wrong number," but nothing else.

10      Again, this -- we need to have a list.  We can't have a

11  boundless similar language kind of discovery request.

12           THE COURT:  Well, I don't -- you know.  I don't know

13  what you get.  What was posited to me was there's also "Wrong

14  number" that Uber wasn't producing.  I don't know if there's

15  anything else that they've excluded from the log.

16           MR. GRILLE:  Right, and we don't know either, but that's

17  -- I think we're on the same page.  We just want to clarify that

18  it's everything, including further Uber code messages that come in

19  response to those "STOP," "Wrong number," and "Cancel."

20           THE COURT:  That's Ms. Rogers as I read the complaint.

21  That's her allegation, that she continued to get these.

22           MR. GRILLE:  Okay.

23           THE COURT:  Sounds like there was a glitch or something

24  that was going on.  Right.  So that's what -- right? -- Uber is

25  going to produce the --

1          MS. CHEUNG:   I understand that that's what you're

2     ordering, Your Honor.

3          THE COURT:   Okay.

4          MS. CHEUNG:   And if there was a response to something

5     that is -- that someone claiming wrong number, although we

6     obviously dispute that that's truly a wrong number, that we

7     understand that that's what you're ordering.

8          THE COURT:   Okay.

9          MS. CHEUNG:   And I would, Your Honor -- I do think that

10    the -- I gave it one shot, but the anonymized numbers really

11    should do what Plaintiffs need to do without them having to go

12    look for a wrong number plaintiff which we do believe that that's

13    what they're trying to do here.   Because if they are just

14    concerned about figuring out commonality, which is the only thing

15    that they argued in their letter, is there some kind of common

16    experience, knowing exactly which individual received which text

17    message allows them to do that pursuant to the only claims Ms.

18    Rogers has, which is not a wrong number claim.

19         THE COURT:   Right, but I guess I don't -- I mean, it's

20    more of a burden for Uber.   I don't really think it's much of a

21    privacy issue, considering they voluntarily, according to Uber,

22    gave their name and number, and it's subject to a protective order

23    and counsel's going to be prohibited from using that information

24    to contact them.   Right?

25        Counsel have all sorts of other ways which is how they get

1   their plaintiffs all the time to do it, and those are the methods
2   they should use.   And they're going to be prohibited from
3   contacting them.
4        Okay.
5             MR. GRILLE:   Thank you, Your Honor.
6             MS. CHEUNG:   Thank you.
7             THE COURT:   Thank you.
8             THE CLERK:   Court's in recess.
9        (Proceedings adjourned at 9:34 a.m.)
10
11            I, Peggy Schuerger, certify that the foregoing is a
12  correct transcript from the official electronic sound recording
13  provided to me of the proceedings in the above-entitled matter.
14
15  _____        October 27, 2019
    Signature of Approved Transcriber         Date
16
17  Peggy Schuerger
    Typed or Printed Name
18  *Ad Hoc Reporting*
    Approved Transcription Provider
19  for the U.S. District Court,
    Northern District of California
20
21
22
23
24
25